PILOT FREIGHT CARRIERS,
INC., Appellee,

v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WARE-
HOUSEMEN AND HELPERS OF
AMERICA, Appellant.

No. 80–1547.

United States Court of Appeals,
Fourth Circuit.

Argued April 6, 1981.

Decided Sept. 14, 1981.

Robert J. Higgins, Washington, D. C. (Leslie J. Ruben, Charles W. Saber, George Kaufmann, Dickstein, Shapiro & Morin, Washington, D. C., on brief), for appellant.

J. W. Alexander, Jr., Charlotte, N. C. (William Kearns Davis, Winston-Salem, N. C., Blakeney, Alexander & Machen, Charlotte, N. C., Bell, Davis & Pitt, Winston-Salem, N. C., on brief), for appellee.

Before BUTZNER, SPROUSE and ERVIN, Circuit Judges.

BUTZNER, Circuit Judge:

The principal issue in this appeal is whether Pilot Freight Carriers' claim against the International Brotherhood of Teamsters (IBT) for damages attributed to a strike should have been submitted to arbitration. Pilot brought this action under § 301 of the Labor Management and Relations Act of 1947, 29 U.S.C. § 141 *et seq.* IBT pleaded as an affirmative defense that the controversy was subject to arbitration and moved for summary judgment on the ground that the bargaining agreement required Pilot to grieve its claim. The district court denied the motion and subsequently ruled that the strike breached the bargaining agreement. The court submitted the question of damages to a jury which returned a verdict for Pilot in the amount of $3,030,625. Judgment was entered on the verdict. Because we believe the controversy should have been submitted to arbitration in accordance with provisions of the bargaining agreement, we vacate the judgment of the district court and remand the case with directions that the complaint be dismissed without prejudice to Pilot's submission of its claim to arbitration.

I

The facts and the history of related litigation between the parties are fully set forth in the district court's opinion and in an opinion of the Fifth Circuit dealing with a related aspect of this litigation. *See Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters,* 495 F.Supp. 619 (M.D.N.C.1980); *Boire v. International Brotherhood of Teamsters,* 479 F.2d 778 (5th Cir. 1973). Briefly recounted, the bargaining agreement which is the basis of Pilot's claim is the National Master Freight Agreement and the Southern Conference Supplement effective from April 1, 1970, to June 30, 1973. The Master Agreement was applicable to all signatory employers, including Pilot, and all Teamster locals. The Southern Supplement dealt primarily with regional concerns. Together, they constituted the parties' bargaining agreement. The bargaining agreement made provision for a Multi-State Grievance Committee and a National Grievance Committee, both composed of employer and employee representatives.

The strike arose over a dispute about the application of the accretion clause of the Master Agreement to Pilot's terminal operations in Florida. The locals submitted their claims of accretion to the Multi-State Grievance Committee, and the company submitted its claim of no accretion to the National Grievance Committee, asserting that the Multi-State Grievance Committee lacked jurisdiction under the terms of the agreement. The Multi-State Grievance Committee took jurisdiction and held that the accretion clause applied. Pilot refused to accede to this ruling and unsuccessfully sought an injunction against enforcement of the award in Florida. The union then struck. The district court enjoined the strike, but when the National Grievance Committee also ruled that the bargaining agreement was applicable to Pilot's Florida terminals, the court dissolved its injunction. The union threatened to resume the strike. In the meantime, Pilot sought relief from the NLRB which obtained an injunction against the strike and subsequently ruled that accretion was unlawful.

Pilot asserts that a proper interpretation of the bargaining agreement required IBT to submit the grievance over the Florida terminals to the National Grievance Com-

mittee. It argues that the union's strike after the award of the Multi-State Committee violated IBT's contractual obligation not to strike "without first using all means of settlement as provided" in the agreement. IBT contends that the dispute over the obligation not to strike must be submitted to arbitration. Additionally, it contends that by the terms of the agreement it assumed no liability for the performance of the agreement and that, in any event, the locals had a contractual right to strike to enforce the arbitration award of the Multi-State Grievance Committee. It relies on a clause of the Master Agreement which permits strikes "in case of . . . failure to comply with majority decisions under this agreement or any supplement." Contrary to Pilot's position, IBT argues that the bargaining agreement gave the Multi-State Grievance Committee authority to decide the locals' grievance.

## II

We deem it improvident for us to undertake a discussion of the correct interpretation of all of the various provisions of the bargaining agreement which the parties press. Under the terms of the agreement and the national policy pertaining to arbitration of labor disputes enunciated by the Supreme Court, we believe that these issues are properly the subject of arbitration.

Article 8(a) of the Master Agreement provides: "All grievances or questions of interpretation arising under this Master Agreement or Supplemental Agreements thereto shall be processed as set forth below." The agreement next establishes elaborate grievance procedures for the arbitration of disputes. Article 45 of the Supplement provides: "The Unions and the Employers agree that there shall be no strikes, lockouts, tie-ups or legal proceedings without first using all possible means of settlement as provided for in this Agreement of any controversy which might arise."

In its opinion rejecting IBT's claim that the controversy was subject to arbitration, the district court held the arbitration clause was not as broad as those in cases in which arbitration had been recognized as the proper forum. The court also pointed out that the arbitration process established procedures for settling disputes concerning "unauthorized" strikes but that it was silent about "authorized" strikes. Referring to a clause that reserved to the parties the right to institute legal actions except as specifically set forth in the arbitration clause, the court held that Pilot could resort to its legal remedy for an "authorized" strike. *See* Pilot Freight Carriers, Inc. v. Teamsters Local 391, 83 Lab.Cas. (CCH) ¶ 10,572 at 18,222 (M.D.N.C.1977).

We are not persuaded that these reasons sufficed for denying IBT's claim that the controversy was subject to arbitration. The question of arbitrability is a matter of contract to be determined by the courts. *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962). In construing the contract, doubts must be resolved in favor of arbitration. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). It has long been settled that an employer's damage claim for breach of a no-strike clause is subject to arbitration. *Drake Bakeries v. Bakery Workers*, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962).

In *Drake*, 370 U.S. at 257, 82 S.Ct. at 1348, the arbitration clause provided:

> "The parties agree that they will promptly attempt to adjust all complaints, disputes or grievances arising between them involving questions of interpretation or application of any clause or matter covered by this contract or any act or conduct or relation between the parties hereto, directly or indirectly."

In *Long-Airdox Co. v. UAW, Local 772*, 622 F.2d 70, 71 (4th Cir. 1980), the bargaining agreement provided for the arbitration of grievances which were defined as " 'any complaint, request, or dispute which involves the meaning, interpretation or application of this agreement.' " In *H. K. Porter Co., Inc. v. Local 37, USW*, 400 F.2d 691, 693 (4th Cir. 1968), the agreement provided: " 'It is understood and agreed that neither party will institute civil suits or legal proceedings against the other for alleged viola-

tion of any of the provisions of this labor contract; instead all disputes will be settled in the manner outlined in Section 10—Grievances.'" In each of these cases, arbitration of an employer's damage claim that the union breached a no-strike clause was held to preclude the employer's recourse to a suit under § 301 of the Labor Act.

█ The arbitration clause of the Master Agreement does not materially differ from those in *Drake, Long-Airdox,* and *H. K. Porter.* It embraces "all grievances or questions of interpretation," and, consequently, it is broad enough to include Pilot's claim that IBT breached the agreement's no-strike clause. Because the grievances of both parties are facially governed by the agreement, "the means chosen by the parties for settlement of their differences" must be given "full play." *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 566, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). Whether Pilot is right or wrong in claiming that the union violated the no-strike clause when it struck after Pilot refused to comply with the award of the Multi-State Committee is a question of contract interpretation for the arbitrator. 363 U.S. at 568, 80 S.Ct. at 1346.

█ We cannot accept the suggestion that grievances over "authorized" strikes are by implication excluded from arbitration because the Master Agreement establishes procedures for settling "unauthorized" strikes without mentioning "authorized" strikes. We addressed the question of exclusion from arbitration by implication in *H. K. Porter Co. v. Local 37, USW,* 400 F.2d 691, 695 (4th Cir. 1968):

> The canons of construction require the courts not to deny arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," and caution "[i]n the absence of any express provision excluding a particular grievance from arbitration * * * only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail * * *." *United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 584, 80 S.Ct. 1347, 1353, 1354, 4 L.Ed.2d 1409 (1960).

Here, as in *H. K. Porter,* the procedural devices of the arbitration clause do not explicitly exclude arbitration of the question of whether an authorized strike violated the no-strike clause. Our additional observation at 400 F.2d 695 is applicable:

> Exclusion by implication, and the consequent nullification of those provisions which indicate the parties' intention to arbitrate, is contrary to our national labor policy.... [A] collective bargaining agreement "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate." *United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960).

*Drake Bakeries v. Bakery Workers,* 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962), dealt with a somewhat similar question of exclusion by implication. There the no-strike clause insulated the union from damages for unauthorized strikes and mentioned only arbitration of a dispute over whether an employee engaged in an unauthorized strike. Nevertheless, the Court refused to construe the contract as implying an exclusion from arbitration of the company's claim for damages against the union for breach of the no-strike clause by instigating and encouraging a strike. While the factual situation in *Drake* differs from the circumstances presented here, the case illustrates the impropriety of excluding by implication grievances over a strike on the basis of whether the strike was authorized or unauthorized.

█ Furthermore, the grievance provisions of the Master Agreement contain specific criteria for determining whether a strike is "authorized." The company contends that the strike was authorized. IBT, while admitting that it supported the strike, contends that the Agreement's criteria for holding it to be authorized within the context of the grievance procedure have not been satisfied. These contentions raise mixed questions of fact and interpretation of the contract which are the province of the arbitrator and not of the court. *Cf.*

*Long-Airdox Co. v. UAW, Local 772*, 622 F.2d 70, 71–72 (4th Cir. 1980).

Indeed, it would appear quite anomalous to infer that authorized strikes were not subject to arbitration but that they were embraced by the no-strike clause. Arbitration is generally considered to be the *quid pro quo* for the obligation not to strike. *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 407, 96 S.Ct. 3141, 3147, 49 L.Ed.2d 1022 (1976). In short, we hold that whether an authorized strike is subject to arbitration, whether this strike was authorized, and whether the no-strike clause was broad enough to encompass both authorized and unauthorized strikes are questions to be resolved by arbitration. Indeed, the parties appear to have anticipated that disputes could arise over strikes to enforce Grievance Committee awards. They provided in the arbitration clause:

In the event of strikes, work stoppages, or other activities which are permitted in case of deadlock, default or failure to comply with majority decisions under this Agreement or any Supplement thereto no interpretation of this Agreement or any Supplement thereto by any tribunal shall be binding upon the Union or affect the legality or lawfulness of the strike unless the Union stipulates to be bound by such interpretation, it being the intention of the parties to resolve all questions of interpretation by mutual agreement.

This clause, of course, could not preempt the NLRB with respect to the accretion issue. *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778 (5th Cir. 1973). Its effect, however, on the rights of the parties in the context of this dispute is a proper subject of arbitration.

Pilot argues that it is entitled to prosecute this action because the union followed the wrong grievance procedure and struck prematurely in violation of the bargaining agreement. Pilot insists that the proper grievance procedure required submission of the accretion dispute to the National Grievance Committee which, it contends, alone had jurisdiction. In essence, Pilot argues that IBT repudiated the bargaining agreement or waived its right to arbitrate the strike damage claim because it supported a strike that was called before the accretion dispute was decided by the National Grievance Committee. IBT replies that the Multi-State Committee had contractual authority to decide the dispute and that the strike was not premature. It adds that because the locals submitted the accretion question to arbitration and awaited a favorable ruling and the company's refusal to comply before striking, it cannot be held to have repudiated the bargaining agreement or to have waived its right to arbitration of the company's strike damage claim. In any event, IBT insists these issues must be submitted to arbitration.

Without deciding which committee had contractual authority to hear the accretion grievance, we must reject Pilot's argument. In *John Wiley and Sons, Inc. v. Livingston*, 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964), the Court observed:

Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration.... It would be a curious rule which required that intertwined issues of "substance" and "procedure" growing out of a single dispute and raising the same questions on the same facts had to be carved up between two different forums, one deciding after the other. Neither logic nor considerations of policy compel such a result.

Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.

We believe these principles are particularly applicable where, as here, one of the parties to the arbitration mounts a collateral attack on an arbitration award after losing a direct challenge. The record discloses that Pilot unsuccessfully sought to enjoin en-

forcement of the Multi-State Committee's accretion award, but it failed to appeal from the court's adverse ruling. *Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters*, No. 72–160 (M.D.Fla. July 8, 1972) (unpublished). *See also, Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters*, 495 F.Supp. 619, 624 (M.D.N.C.1980).

■ We will not undertake to decide the question whether IBT repudiated the contract or waived its rights to arbitration. Precedent derived from *John Wiley* and *Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 491–92, 92 S.Ct. 1710, 1712–13, 32 L.Ed.2d 248 (1972), establishes that as a general rule the issues of repudiation and waiver should be resolved by arbitration. This precept has been applied to damage claims arising from the alleged breach of a no-strike clause. *Controlled Sanitation Corp. v. District 128, International Association of Machinists and Aerospace Workers*, 524 F.2d 1324, 1329–32 (3d Cir. 1975); *General Dynamics Corp. v. Local 5, Industrial Union of Marine and Shipbuilding Workers*, 469 F.2d 848, 853–54 (1st Cir. 1972). This case presents no occasion to depart from this rule, since the union submitted the underlying dispute to arbitration and awaited a favorable award and the company's refusal to comply before striking.

■ Finally, we conclude that the fact that the union called the strike while proceedings before the NLRB were pending does not preclude arbitration of the claim that the strike breached the bargaining agreement. The administrative and legal proceedings involving Pilot's unit clarification petition and the union's unfair labor practices did not purport to interpret or apply the bargaining agreement. Instead, the proceedings were prosecuted to vindicate the Board's primary authority to determine the question of accretion at Pilot's Florida terminals. *See Boire v. International Brotherhood of Teamsters*, 479 F.2d 778 (5th Cir. 1973).

Commenting on the differences between unfair labor practices and violations of bargaining agreements, the Supreme Court has observed that "Congress deliberately chose to leave the enforcement of collective agreements 'to the usual processes of the law.'" *Dowd Box Co. v. Courtney*, 368 U.S. 502, 513, 82 S.Ct. 519, 526, 7 L.Ed.2d 483 (1962). Therefore, whether the bargaining agreement is breached by calling a strike while NLRB proceedings are pending requires interpretation of the agreement to ascertain whether the parties have contracted to bar such a strike. In this case, resolution of this question is a function of the arbitrator pursuant to the parties' broad arbitration clause that requires submission of "all grievances or questions of interpretation arising under" the collective bargaining agreement.

■ Of course, the awards of the Multi-State Committee and the National Grievance Committee in favor of the union on the accretion controversy were not final and binding. The question of accretion is ultimately committed to the NLRB. Although the parties may arbitrate this issue, the bargaining agreement's provisions pertaining to accretion cannot supplant the Board's authority. *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 794 (5th Cir. 1973). Thus, the Board's assumption of jurisdiction was sufficient to obtain an injunction pursuant to § 10(j) of the Labor Act, 29 U.S.C. § 160(j). *Boire, supra.* The Board's decision and order, issued long after the strike, protected company from judicial enforcement of the awards. *Carey v. Westinghouse Corp.*, 375 U.S. 261, 268, 84 S.Ct. 401, 407, 11 L.Ed.2d 320 (1964). Recognition of these principles, however, does not answer the question of whether the Multi-State Committee's award and the company's refusal to comply were sufficient for the union's invocation of the bargaining agreement's exception to the no-strike clause. This is an issue concerning the meaning of the compliance clause, the no-strike clause, and the exceptions to the latter which must be determined by interpreting the bargaining agreement, a function the parties committed to the arbitrator. *See Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 405, 96 S.Ct. 3141, 3146, 49 L.Ed.2d 1022 (1976).

We express no opinion on IBT's other assignments of error or on the merits of this controversy. The company may, or may not, be entitled to damages, but the rights and obligations of the parties must be determined by the grievance procedure set forth in their bargaining agreement. Our consideration of the case has been tempered by the admonition emphasized in *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 569, 80 S.Ct. 1343, 1347, 4 L.Ed.2d 1403 (1960):

> The [company] claimed in this case that the [union] had violated a specific provision of the contract. The [union] took the position that it had not violated that clause. There was, therefore, a dispute between the parties as to "the meaning, interpretation and application" of the collective bargaining agreement. Arbitration should have been ordered. When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal.

Accordingly, we vacate the judgment of the district court and remand with direction to dismiss this action without prejudice to the parties' right to arbitrate their dispute. *See Chesapeake & O. Ry. v. Ford*, 590 F.2d 557, 559 (4th Cir. 1979); *General Dynamics Corp. v. Local 5, Industrial Union of Marine and Shipbuilding Workers*, 469 F.2d 848, 854 (1st Cir. 1972).